SILVER SAGE PARTNERS, LTD., Robert E. Fillet, Paul Saben, Richard L. Earlix, Michael S. Linsk, Plaintiffs–Appellants,

v.

CITY OF DESERT HOT SPRINGS, Desert Hot Springs City Council, John Isaacs, Mayor, Daniel Been, Mike Segrist, Sue Wood, Defendants–Appellees.

Nos. 99–56917, 99–56919, 99–55920.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 5, 2001

Opinion Filed May 21, 2001

Opinion Withdrawn June 1, 2001

Opinion Filed June 1, 2001

William J. Davis, Min Chang, and Won Chang, Davis & Company, P.C., Los Angeles, California, for the plaintiffs-appellants.

Kevin Patrick McVerry, Graves, Roberson & Bourassa, Thousand Oaks, California, for the defendants-appellees.

Before: Procter Hug, Jr. and Betty B. Fletcher, Circuit Judges, and Susan Y. Illston,* District Judge.

## ORDER AND OPINION

B. FLETCHER, Circuit Judge:

### ORDER

The opinion filed on May 21, 2001 is withdrawn.

### OPINION

We must decide whether a jury's award of damages in the amount of $3,040,439 was against the clear weight of the evidence. Because we conclude that it was not, we reverse and remand with instructions that the jury's verdict be reinstated. We must also decide whether plaintiffs who have established a defendant's liability under the Fair Housing Act must demonstrate a reasonable likelihood of future violations of the Act in order to be entitled to injunctive relief under the Act. We conclude that they need not and so reverse and remand for reconsideration.

## BACKGROUND

Silver Sage Partnership, Ltd. (the partnership or Silver Sage) is a partnership organized to purchase and develop low-income housing at a mobile home park in the City of Desert Hot Springs, California (the city). Paul Saben and Richard Earlix were the partnership's principals. In 1990, the partnership entered into an agreement with Huntington Savings and Loan to purchase the Silver Sage Mobile Home Park, which was located in the city.[1] The partnership initially sought to finance the project with bonds to be issued by Riverside County. Although the county approved a bond resolution for that purpose, it required the consent of the city, which the city would not give.

The partnership next tried to obtain financing from the state of California, believing that state financing would not require city approval. Because it planned to develop low-income housing, the California Tax Credit Allocation Committee agreed to provide the partnership tax credits in the amount of $8,248,370. For the same reason, the partnership was able to obtain a commitment for a favorable fifty-five year mortgage in the amount of $4,233,265 from the California Housing Department (CHD) under its Rental Housing Construction Program (RHCP). The involvement of CHD triggered the application of Article XXXIV of California's Constitution. That provision requires local voter approval of any low-rent housing projects that are "developed, constructed, or acquired" by a "state public body." CAL. CONST. art. XXXIV, § 1. On December 18, 1990, the city council voted to deny Article XXXIV

---

* The Honorable Susan Y. Illston, United States District Judge for the Northern District of California, sitting by designation.

1. Huntington Savings and Loan went into receivership. On June 30, 1991, the Resolution Trust Corporation (RTC) entered into a "purchase and sale agreement" with the partnership, affirming the original purchase contract.

approval to the partnership's development.[2]

After further attempts to persuade the city to change its mind failed, plaintiffs brought suit under 42 U.S.C. § 3613(a), alleging a violation of section 3604 of the Fair Housing Act.[3] After trial, the jury found for plaintiffs by general verdict and awarded them damages in the amount of $3,040,439. The city filed a motion for judgment as a matter of law or, in the alternative, a new trial. The district court denied the motion for a judgment as a matter of law and denied the motion for a new trial as to liability. However, because it found the jury's verdict "grossly excessive," the district court denied the city's motion for a new trial on the issue of damages conditional on plaintiffs' acceptance of a remittitur to $388,146.20.

Plaintiffs rejected the remittitur and a second trial on damages was held. After trial, the second jury awarded nominal damages for plaintiffs. After entry of judgment, plaintiffs filed a motion seeking to have the district court "amend" the second jury's damage award or, in the alternative, for a new trial as to damages. Plaintiffs also sought an injunction ordering the city to cease violating the Fair Housing Act. The district court denied both motions. However, the district court did grant plaintiffs' motion to reconsider its previous denial of attorney's fees. The district court decided that since plaintiffs had established the city's liability but had only obtained nominal damages from the jury, it would award plaintiffs $57,000 in attorney's fees.

Plaintiffs now appeal (1) the district court's order granting a new trial on damages because of plaintiffs' refusal to accept the remittitur, (2) the district court's denial of their motion to amend the second jury verdict or order a new trial on damages, (3) the district court's denial of injunctive relief, and (4) the amount of the district court's award of attorney's fees.[4] We have jurisdiction under 28 U.S.C. § 1291.

## DISCUSSION

### A. Remittitur/New Trial

#### i. Standard of Review

■ We review a district court's grant of a new trial for an abuse of discretion. *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir.1999). We conclude that the same standard of review is appropriate here, where a plaintiff re-

---

2. Prior to bringing suit in federal court, the partnership sought a "writ of mandate," in state court to compel the city to grant approval under Article XXXIV. The state trial court denied issuance of the writ and the partnership appealed. While plaintiffs' federal case was pending, the California Court of Appeal held in an unpublished opinion that "the power to approve or disapprove low-rent housing projects under article XXXIV is reserved for the voters in the community and cannot be delegated to the city council." However, the partnership could not take advantage of the ruling by seeking a referendum on its project because by the time the court of appeals ruled, the RHCP program had exhausted its funds.

3. In addition to the city, plaintiffs also sued the City Council for the City of Desert Hot Springs as well as many persons in their official and individual capacity. By the time of trial, the district court had either dismissed or summarily adjudicated all claims against the individual defendants. Plaintiffs do not appeal from those decisions. Plaintiffs also brought various state law claims and a claim under 42 U.S.C. § 1983. The district court either dismissed or summarily adjudicated these claims. Plaintiffs do not appeal those decisions.

4. The city initially appealed the district court's award of attorney's fees, but it has abandoned its appeal.

jects the remittitur and a second trial is held, for the outcome is the same in both cases-the district court overrides the jury's verdict. *Cf. Browning–Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 279, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (holding that court of appeals should review for an abuse of discretion district court's denial of new trial for punitive damages conditional on plaintiff's acceptance of remittitur).

Under the abuse of discretion standard, even if substantial evidence supports the jury's verdict, a trial court may grant a new trial if "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *4.0 Acres of Land*, 175 F.3d at 1139 (internal quotation marks and citation omitted). We will uphold a district court's grant of a new trial if any of its grounds for granting the new trial are reasonable. *Id.* However, a district court may not grant a new trial simply because it would have arrived at a different verdict. *Id.* Thus if the jury's verdict is not against the clear weight of the evidence, we may find that a district court abused its discretion in granting a new trial. *Id.*

The proper interpretation of a federal statute is a question of law that we review de novo. *U.S. v. Stephens*, 237 F.3d 1031, 1033 (9th Cir.2001).

#### ii. Analysis

The jury granted plaintiffs an award of $3,040,439 in damages. The jury's award was not against the clear weight of the evidence. The district court therefore abused its discretion in requiring plaintiffs to choose between a new trial and a remittitur.

Plaintiffs' damages expert (the expert) testified that the city's failure to approve the project cost plaintiffs $4,587,679 in damages. The district court found that some of the losses considered by the expert in calculating plaintiffs' damages (a) included lost profits which were too speculative, (b) failed to account for anticipated costs and an anticipated return, (c) included losses to individuals who were only marginally affected by the city's discriminatory practices, (d) included losses due to a purely speculative tax increase and (e) double counted the partnership's losses. Deducting these losses from the expert's total, the court concluded that the most that plaintiffs could claim was $1,847,067.20. However, the district court found that even an award in this amount would be "grossly excessive," because Silver Sage failed to mitigate its damages. Relying on a feasibility study Saben conducted in September 1989 for Huntington Savings and Loan, then the owner of the Silver Sage Mobile Home Park, the district court concluded that the partnership could have developed the project "as a market rate mobile home park and sold [it] for $1,458,918 after rent up." Deducting this from the amount it determined was the maximum losses Silver Sage suffered, the district court concluded that the city was liable for no more than $388,146.20. The district court denied the city's motion for a new trial on damages, conditional on plaintiffs' acceptance of a remittitur to $388,146.20. Plaintiffs argue that the district court's order was an abuse of its discretion. Plaintiffs' argument has merit.

#### a. "Speculative" Lost Profits

The district court objected to various alleged losses because it found them "too speculative." The court stated that the expert testified that project income "must be used first for operating expenses, then to pay the management fee, then to

pay interest on the loan from the State of California, then to pay principal on that loan and only then would Silver Sage partners receive any remaining profit." The court also claimed that the expert testified that his calculation of damages assumed that Silver Sage would pay its loan obligation in full each year for fifty-five years. In addition, according to the court, Saben, one of the project's developers, testified both in court and before the city council that "he did not consider the loan from the State of California an obligation that had to be repaid [and that] the Silver Sage partnership's projected income stream would never be sufficient to pay much if any of the principal or interest on that loan." The court characterized Saben's testimony as uncontroverted by any other evidence presented at trial. Because it found that the evidence showed that neither the principal nor the interest on the loan would be paid off and that the partnership could receive profit only after the loan was paid, the district court concluded that the expert's projected profits were too speculative. It therefore deducted them from the jury's award in calculating the value of the remittitur.

Plaintiffs dispute the district court's characterization of the evidence. They are right to do so. The district court mischaracterizes the expert's and Saben's testimony. The district court was correct to note that the expert's damages calculations assumed payment on the loan each year. However, the court claimed that Saben testified that the project's projected income stream "would never be sufficient to pay much if any of the principal or interest on the loan." In support of this claim, the court cites Saben's comments to the city council and his trial testimony. While Saben did express some doubts before the city council about Silver Sage's ability to make payments on the loan,[5] his trial testimony is consistent with the expert's assumption that the partnership would make payments on the loan each year. After establishing that Saben had made projections concerning loan repayments, plaintiffs' counsel asked Saben what the projections showed. Saben replied: "Projections showed, by the end of the fifteenth year, the payment on the loan would have just about reached the amount of the annual interest, and subsequently, there would have been some principal payments, beginning in the years after the fifteenth."[6]

5. Saben testified as follows concerning his comments before the city council:

Q [by defense counsel]: Sir, isn't it true that you told the City Council that your calculations showed there is no way that-because of the low rents-there is no way that there's going to be very much payment made on those loans?
A [by Saben]: I did say that.

6. Saben's projections are in some ways more optimistic than the expert's, since the expert did not anticipate payment on the principal until the thirty-third year of operation. It is unclear to what extent Saben's projections and the expert's calculations would lead to different assessments of Silver Sage's lost profits. However, the mere fact that different assessments are possible is not a reason for excluding the lost profits as "too speculative."

See *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C.Cir.1997) (stating that, in action under the Fair Housing Act, "while a plaintiff seeking to recover lost profits must ordinarily prove the fact of injury with reasonable certainty, proof of the amount of damages may be based on a reasonable estimate"); *see also Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931) ("Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a

This testimony in no way supports the district court's claim that Saben testified that project income "would never be sufficient to pay much if any of the principal or interest on the loan." [7]

The district court also claimed that the expert testified that the partners would receive profits only after "payment in full of interest and principal." The district court cites to two passages from the expert's testimony to support its claim. The first passage directly conflicts with the court's characterization. In it, the expert states that in any year in which operating income exceeds operating expenses-including the debt service *due that year*-some of the excess income would go to the partnership.[8] This testimony is fully consistent with the expert's report, which was introduced into evidence, which states that, pursuant to state regulations, the partnership would receive some profits in any year that operating income exceeds pay-

ment on the loan, including payment for any accrued interest balance. The second passage the district court cites merely confirms that if the partnership failed to make payments on its loan, its profits would be reduced.[9]

No evidence supports the district court's finding that the partnership would realize profits only after the entire loan obligation was repaid. While Saben's comments before the city council would appear to indicate a concern about whether the project would be able to pay its loan obligations, Saben's trial testimony is fully consistent with the expert's assumption that the project would make annual mortgage payments. We therefore conclude that a jury verdict that included damages for lost profits based on the expert's calculations would not be against the clear weight of the evidence and that the district court's exclusion of these damages was an abuse of discretion.

matter of just and reasonable inference, although the result be only approximate.").

7. It is true, as the district court suggests, that Saben testified that the partnership did not have a legal obligation to pay back the loan. Saben testified, for example, that "[t]here were no requirements of any payments of the principal or interest be made for fifty-five years. No foreclosure for nonpayment of either principal or interest." However, this statement is not evidence that Silver Sage would not have made payments on the loan. If, as the expert testified and stated in his report, the partnership could realize profits in any year only after paying off the interest accrued through that year, *see infra*, then the partnership would be motivated to make payments whether or not it was legally obligated to do so. In any case, Saben's testimony that the partnership was not obligated to pay off the loan is not inconsistent with his testimony concerning his projections for loan repayments.

8. The expert testified:
The arrangement with the state had a provision that, after the operating expenses, which include the, if you will, management

fee from the partnership to run the facility, and after the debt service, principal and interest payments *per the 55–year schedule* were paid. If there were remaining funds, those funds would be available to the partnership.
(emphasis added).

9. Defense counsel asked the expert to review the minutes of the December 18, 1990 city council meeting. The following colloquy ensued:

Q [by defense counsel]: ... [D]o you see where Mr. Saben has indicated to the council that there would be no way, that because of the low rents, that there is going to be, very much, payments made on these loans; there will be some payments made. Do you see that?
. . . .
A [by the expert]: I do. . . .
Q: ... [I]f the loans are not paid back, do you agree that the sale proceeds that would go to the Silver Sage Partners would be reduced?
A: Yes.

### b. "Anticipated" Costs and Return

■ The district court also faulted the expert's calculation of Silver Sage's lost profits because it failed to take into account certain costs which, the court claimed, the partnership "would have been obligated to pay" had the project gone forward. The court stated that Silver Sage "promised to pay $125,000 for state-mandated child care facilities" and "to pay an additional $258,000 for temporary classrooms." The court therefore deducted these amounts from the jury verdict in calculating the remittitur amount. In support of this finding, the district court cited a memorandum written by Saben and Earlix. The memorandum clearly expresses Silver Sage's plan to create a child care facility. However, there is no evidence that this expression of intention created a binding obligation on the partnership. Nor does the city point to any evidence in the record that the creation of a child care facility is mandated by state law. Similarly, the city fails to identify any evidence that the partnership was legally obligated to pay anything for the creation of temporary classrooms.

Because no evidence supports the district court's finding that Silver Sage would have been obligated to pay for the child care facilities and for the temporary classrooms had the project gone forward, a jury verdict that did not exclude these amounts would not be against the clear weight of the evidence. The district court's exclusion of these amounts was an abuse of discretion.

■ The district court also objected to the expert's calculation of the partnership's out-of-pocket expenses. Among those expenses, the expert counted $34,991

in an escrow account held by the RTC. The escrow account contained earnest money for the purchase of the project. The court noted that the expert included the amount in escrow in the event that none of it was returned by the RTC and that the expert testified that he had no information as to whether the RTC would return it. Because "no evidence indicated that [the RTC] would not" return the escrow funds, the court concluded that the possibility that the RTC would not return the funds was "too speculative to be included in the Partnership's damages." The court therefore excluded the escrow funds from its remittitur calculations.

However, as Silver Sage points out, the purchase and sale agreement-which was entered into evidence-explicitly states that the funds in the escrow account "were to be treated as liquidated damages and forfeited to Seller if the transaction was not consummated,"[10] A jury damages award that included the $34,991 in the RTC escrow account is not against the clear weight of the evidence. We therefore hold that the district court abused its discretion in excluding this amount in its remittitur calculations.

### c. "Marginally Affected" Individuals

The district court objected to the inclusion as part of plaintiffs' damages of a commission that would have been payable to Michael Linsk, a real estate broker, had the purchase of the project gone through, and to a syndication fee that would have been payable to Robert Fillet. The court held that the Fair Housing Act "does not entitle all persons however marginally affected by discriminatory practices to recover for all attenuated harm suffered." It concluded that the harms suffered by

---

10. Plaintiffs also correctly note that Saben testified that the RTC did not return the earnest money to them.

Linsk and Fillet were too attenuated.[11] The court thus excluded both Linsk's commission and Fillet's syndication fee from the damages that plaintiffs could recover.

■ Plaintiffs argue that the district court improperly narrowed the remedies available under the Fair Housing Act. We agree. In *San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470 (9th Cir.1998), we noted that

> [t]he Supreme Court has long held that claims brought under the [Fair Housing] Act are to be judged under a very liberal standing requirement.... [T]he sole requirement for standing under the Act is the Article III minima of injury in fact. To meet this requirement, a plaintiff need only allege that as a result of the defendant's discriminatory conduct he has suffered a distinct and palpable injury. [Thus, u]nder the Act, any person harmed by discrimination, whether or not the target of discrimination, can sue to recover for his or her own injury. This is true, for example, even where no housing has actually been denied to persons protected under the Act.

159 F.3d at 475 (internal quotation marks, citations, and brackets omitted). The district court did not find that Linsk and Fillet had not lost their respective commission and syndication fee because of the city's discrimination. Rather, it held only that their injuries are too attenuated to merit recovery. Linsk and Fillet adequately plead injury in fact as a result of the city's discriminatory action. The jury found that the city had violated the Fair Housing Act and awarded plaintiffs damages. Linsk and Fillet therefore had a right under the Act to recover for their injuries. *Cf. Crumble v. Blumthal*, 549 F.2d 462, 465, 468–69 (7th Cir.1977) (holding that district court abused its discretion in denying real estate brokers' motion to intervene in case brought under the Fair Housing Act, where brokers alleged that defendant-sellers promised to pay commission on sale, but where sellers refused to perform on their contract to sell because of the buyer's race).

In excluding Linsk's commission and Fillet's syndication fee from the damages plaintiffs could claim, the court committed legal error.

### d. Loss from Potential Tax Increase

■ At the time the expert calculated plaintiffs' damages, it was predicted that then-President-elect Clinton would propose an increase in the highest marginal tax rate from thirty-one to thirty-six percent and would propose a ten percent surcharge on incomes exceeding one million dollars. The expert concluded that the developer and syndicator fees that some of the plaintiffs were seeking as damages would be subject to the expected tax increase. Had the city not stopped the project, the fees would have been subject to the lower marginal tax. The expert calculated the taxes that the plaintiffs would have to pay on the fees under the proposed changes and included as damages the difference between this and the amount that

---

**11.** The district court questioned "whether Linsk has standing to maintain this suit" but did not rule on the issue. A party's standing is a condition of our subject matter jurisdiction. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (stating that standing is a jurisdictional requirement of Article III). We therefore address the issue and conclude, as discussed below, that Linsk does have standing to bring a claim under the Fair Housing Act. *See Hernandez v. Campbell*, 204 F.3d 861, 865 (9th Cir.2000) ("Federal courts are always under an independent obligation to examine their own jurisdiction." (internal quotation marks and citation omitted)).

would be owed under the current tax scheme.

■ The court excluded the tax damages in part because the loss was too speculative. The district court was correct to exclude the tax damages for this reason. At the time the expert prepared his damages calculations, it was merely speculative whether the tax rate would be changed in the manner he assumed. Although compensatory damages need not be determined with certainty, they may not be based upon "mere speculation or guess." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

The district court did not abuse its discretion in excluding the damages for increase in tax from its calculation of the damage award to which plaintiffs were entitled.

### e. Mitigation

After the various adjustments, the district court calculated that the maximum amount of damages that plaintiffs could have claimed was $1,847,067.20. Relying on *Herrington v. County of Sonoma*, 834 F.2d 1488 (9th Cir.1987), the court concluded that an award of even this much would be grossly excessive because Silver Sage had not attempted to mitigate its damages.

Specifically, the court found that in September 1989, Saben conducted a feasibility study in which he concluded that the project "could be developed as a market rate mobile home park and sold for $1,458,918 after rent up." [12] Because the partnership failed to purchase the property and develop it as a market rate mobile home park, the district court concluded that it failed properly to mitigate its damages. It therefore deducted $1,458,918 from $1,847,067.20, the maximum it had previously concluded plaintiffs could claim, and held that the city was liable for no more than $388,146.20.

In *Herrington*, plaintiffs brought a § 1983 action in which the county rejected the plaintiff-landowners' subdivision application and subsequently "downzoned" the area in which the plaintiffs' land was located. The district court granted injunctive relief and the jury awarded 2.5 million dollars in damages. *Id.* at 1490–91. We vacated the damages award, in part, because we concluded that the award compensated the plaintiffs for a complete deprivation of the development potential of their property. However, because the court declared the county's decision invalid, the plaintiffs regained the ability to develop their property. Thus, we concluded that because the award was based on an assumption that the plaintiffs suffered a complete deprivation of development rights, it was excessive. *Id.* at 1503–06.

Plaintiffs argue that *Herrington* has no application to their case because, unlike the plaintiffs in *Herrington*, they do not own the property at issue. The district court recognized that the partnership did not own the property. Nonetheless, it concluded that because there was evidence that the partnership could still purchase and develop the property as a "market rate" enterprise, it had a duty to do so. The court provided no legal authority to support the proposition that a party harmed by another's violation of the Fair Housing Act has a duty to mitigate its damages.

---

12. Saben conducted the 1989 study for Huntington Savings and Loan, at the time the owner of the Silver Sage Mobile Home Park.

■■ Assuming without deciding that Fair Housing plaintiffs such as the partnership have a duty to mitigate damages, that duty requires the plaintiff to do no more than is reasonable to avoid damages. *See* RESTATEMENT (SECOND) OF TORTS: AVOIDABLE CONSEQUENCES § 918(1).[13] The partnership planned to purchase the mobile home park by using a combination of state tax credits and a favorable mortgage from the RHCP. The partnership was able to obtain the RHCP mortgage because it was going to develop the project as low and very low-income housing. When the city denied approval, the partnership no longer had access to the RHCP loan.[14] Even if we ignore the fact that by the time the city disapproved of the project, the partnership was having financial difficulties, it is simply not reasonable to expect the partnership to have mitigated damages by purchasing the property without the benefit of the favorable RHCP mortgage. Indeed, there is absolutely no evidence in the record that the partnership had available any other source of financing for purchasing the project.

Herrington has no bearing on this case. Even assuming that the partnership had a duty to mitigate its damages, purchasing the mobile home park without the benefit of the RHCP mortgage was not a reasonable option. The district court abused its discretion in excluding the $1,458,918 from the damages plaintiffs could have claimed.

\* \* \*

■ We have concluded that the district court was correct to exclude the $118,982 potential loss from the predicted tax increase as too speculative, but that the court either abused its discretion or committed an error of law in excluding the other claimed damages. What remains is the district court's exclusion of a loss the court characterized as "double counting." We need not determine whether the district court was correct to exclude this loss because, even excluding this amount, the amount of damages that the evidence would support ($3,164,840) is more than the amount the jury awarded plaintiffs ($3,040,439). We therefore reverse the district court's grant of defendant's motion for a new trial because of plaintiffs' refusal to accept a remittitur to $388,146.20 and remand with instructions to reinstate the verdict awarding damages in the amount of $3,040,439 to plaintiffs by the jury in the first trial. *See 4.0 Acres of Land*, 175 F.3d at 1143 ("The jury award was not outside the range of evidence presented and a new trial should not have been granted.") (reinstating original jury verdict).

**B. Attorney's Fees**

42 U.S.C. § 3613(c)(2) provides that in an action brought under § 3613(a), a dis-

---

13. SECTION 918 STATES
(1) EXCEPT AS STATED IN SUBSECTION (2), ONE INJURED BY THE TORT OF ANOTHER IS NOT ENTITLED TO RECOVER DAMAGES FOR ANY HARM THAT HE COULD HAVE AVOIDED *by the use of reasonable effort or expenditure* AFTER THE COMMISSION OF THE TORT.
(2) ONE IS NOT PREVENTED FROM RECOVERING DAMAGES FOR A PARTICULAR HARM RESULTING FROM A TORT IF THE TORTFEASOR INTENDED THE HARM OR WAS AWARE OF IT AND WAS RECKLESSLY DISREGARDFUL OF IT, UNLESS THE INJURED PERSON WITH KNOWLEDGE OF THE DANGER OF THE HARM INTENTIONALLY OR HEEDLESSLY FAILED TO PROTECT HIS OWN INTERESTS.
RESTATEMENT (SECOND) TORTS § 918 (emphasis added).

14. The district court states that Saben testified that the partnership "did not pursue any other options because the Rental Housing Construction Program had decided-before the City Council had denied ... approval-not to provide funds to the project." This mischaracterizes Saben's testimony.

trict court "in its discretion, may allow the prevailing party ... a reasonable attorney's fee and costs." After the second trial, the district court granted plaintiffs attorney's fees in the amount of $57,000. Analyzing plaintiffs' motion for attorney's fees under 42 U.S.C. § 1988, the court concluded that because they established the city's liability, they were "prevailing parties" within the meaning of the act and so eligible for attorney's fees.[15] However, because plaintiffs only won nominal damages in the second trial, the court limited its award of attorney's fees to compensation "for a reasonable amount of time spent in obtaining a favorable verdict on the issue of liability." Plaintiffs appeal from the district court's award of attorney's fees, arguing that, should we reinstate the first jury's verdict, the fee award should be based on the first jury's damages award.

Because we reinstate the first jury's verdict, we vacate the district court's award of attorney's fees and remand with instructions that the district court should reconsider what constitutes "reasonable attorney's fee[s]" in this litigation, in light of the first jury's award. 42 U.S.C. § 3613(c)(2). The district court should also consider the time and effort expended on the second trial and attendant motions.

## C. Remaining Issues

Because we reinstate the original jury verdict, it is unnecessary for us to consider any of plaintiffs' remaining claims, except one. After the end of the second trial, plaintiffs requested an injunction under § 3613(c)(1) enjoining the city from further violation of the Fair Housing Act or, in the alternative, an evidentiary hearing to determine the scope of necessary remedial measures.[16] The district court held that to obtain injunctive relief, plaintiffs "must show reasonable likelihood of future violations of the Fair Housing Acts." Finding that plaintiffs provided no evidence that the city was reasonably likely to violate the Fair Housing Act in the future, the district court denied plaintiff's motion.

### i. Standard of Review

■■■■ We review a district court's decision concerning a permanent injunction for an abuse of discretion, but we review any determination that underlies the court's decision by the standard that applies to that decision. *Dare v. California*, 191 F.3d 1167, 1170 (9th Cir.1999). Whether a plaintiff must show evidence that a defendant is reasonably likely to violate the Fair Housing Act in order to

---

**15.** The Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, provides that plaintiffs who successfully bring actions under certain civil rights acts are eligible for attorney's fees. Although the language of § 1988 and that of § 3613(c)(2) are almost identical, the court should have analyzed plaintiffs' motion for attorney's fees under § 3613(c)(2) because that is the statute providing for such awards in cases brought under § 3613(a) and because the Fair Housing Act is not among the civil rights statutes enumerated in § 1988. However, the district court properly could have relied upon cases interpreting § 1988 since "fee-shifting statutes' similar language is a strong indication that they are to be interpreted alike." *Indep. Fed'n of Flight Attendants v. Zipes,* 491 U.S.

754, 758 n. 2, 109 S.Ct. 2732, 105 L.Ed.2d 639 (1989) (internal quotation marks and citation omitted); *see also* 42 U.S.C. § 3602(o) (" 'Prevailing party' has the same meaning as such term has in section 1988 of this title.").

**16.** Section 3613(c)(1) states that if a district court "finds that a discriminatory housing practice has occurred or is about to occur, the court may ... grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate)."

obtain an injunction under § 3613(c)(1) is a question of law. We review questions of law de novo. *Torres–Lopez v. May,* 111 F.3d 633, 638 (9th Cir.1997).

*ii. Analysis*

 Plaintiffs argue that in holding that the they must establish a reasonable likelihood that the city would continue to violate the Fair Housing Act, the district court reversed the burden of persuasion. They contend that since they have established that the city has violated the Fair Housing Act, future violation should be presumed. Plaintiffs' argument has merit. We have held that where a defendant has violated a civil rights statute, we will presume that the plaintiff has suffered irreparable injury from the fact of the defendant's violation. *Smallwood v. Nat'l Can Co.,* 583 F.2d 419, 420 (9th Cir.1978) (discussing Title VII); *see also Burlington N. R.R. Co. v. Dep't of Revenue,* 934 F.2d 1064, 1074 (9th Cir.1991) ("The standard requirements for equitable relief need not be satisfied when an injunction is sought to prevent the violation of a federal statute which specifically provides for injunctive relief." (internal quotation marks and citation omitted)); *Gresham v. Windrush Partners, Ltd.,* 730 F.2d 1417, 1423 (11th Cir.1984) (stating that "irreparable injury may be presumed from the fact of discrimination and violations of fair housing statutes"). The jury returned a verdict in favor of plaintiffs, finding that the city had violated the Fair Housing Act. The city does not contest its liability. We therefore vacate the district court's order denying plaintiffs' motion for an injunction and remand for reconsideration.

## CONCLUSION

Because the district court abused its discretion and committed legal error in imposing a choice on plaintiffs to accept a remittitur or face a new trial on damages, we reverse the district court's order and remand with instructions to reinstate the first jury's verdict. Because the district court improperly shifted the burden to the plaintiffs to demonstrate irreparable injury, we vacate the district court's order denying plaintiffs' motion for an injunction and remand for reconsideration.

REVERSED AND REMANDED WITH INSTRUCTIONS.