285 F.3d 808
 SEA-LAND SERVICE, INC., Plaintiff,
v.
LOZEN INTERNATIONAL, LLC, Defendant.
Lozen International, LLC, Counterclaimant-Appellant,
v.
Sea-Land Service, Inc., Counter-defendant-Appellee.
 No. 00-57058.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted February 13, 2002.
 Filed April 3, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Mary Kay Reynolds, Law Offices of Mary Kay Reynolds, Culver City, CA, for the counterclaimant-appellant.
 Stephen M. Uthoff, Coniglio & Uthoff, Long Beach, CA, for the counterdefendant-appellee.
 Appeal from the United States District Court for the Central District of California, Florence-Marie Cooper, District Judge, Presiding.
 Before: BEEZER, TASHIMA, and GRABER, Circuit Judges.
 OPINION
 GRABER, Circuit Judge:
 
 
 1
 Plaintiff Sea-Land Service, Inc. (Sea-Land), brought this action against Defendant Lozen International, LLC (Lozen), to recover money owed under a shipping contract. Lozen counterclaimed for damages resulting from Sea-Land's failure to timely deliver one of the shipments at issue. The parties settled and dismissed Sea-Land's claim, but they were unable to reach an agreement with respect to Lozen's counterclaims. As to those, the district court entered summary judgment in favor of Sea-Land.
 
 
 2
 Lozen appeals, arguing that (1) the parties entered into a special oral contract for carriage of the shipment and, therefore, the terms printed on Sea-Land's international bills of lading do not control the parties' agreement; (2) the Carriage of Goods by Sea Act (COGSA), 46 U.S.C.App. §§ 1300 1315, does not apply to the shipment; (3) assuming COGSA applies, there is a genuine issue of fact as to whether there was an "unreasonable deviation" by Sea-Land; (4) even if the terms on SeaLand's bills of lading do control the parties' agreement, there is a genuine issue of fact as to whether the "liberty clauses" in the bills of lading protect Sea-Land from liability; and (5) a number of the district court's evidentiary rulings were erroneous.
 
 
 3
 We have jurisdiction under 28 U.S.C. § 1291, and we hold that (1) the terms on Sea-Land's international bills of lading control the parties' agreement; (2) COGSA applies to the shipment; (3) the district court erred in granting summary judgment on the issue of "unreasonable deviation"; (4) the court also erred in granting summary judgment on the "liberty clause" issue; and (5) the district court abused its discretion in excluding the e-mail that was offered to prove an unreasonable deviation and Lozen was prejudiced thereby. Accordingly, we reverse and remand for further proceedings.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 4
 Dean Myring, Lozen's president, arranged with Sea-Land to transport three 40-foot containers of grapes from Hermosillo, Mexico, to Felixstowe, England. The containers were to travel by truck from Hermosillo to Long Beach, California. From there, they were to be transported by rail to Elizabeth, New Jersey, where they were to be loaded on the Mathilde Maersk (Maersk), an ocean vessel that would be stopping in Felixstowe. The estimated departure date of the Maersk was June 20, 1999, with an estimated arrival in Felixstowe on June 28, 1999.
 
 
 5
 Unfortunately, Sea-Land's railroad agent placed the containers on the wrong train. As a result, Lozen's grapes did not arrive in New Jersey in time for the sailing of the Maersk. Sea-Land notified Lozen of the problem and asked whether the company preferred to send the containers on the next week's vessel or, instead, to sell them domestically. After its customer in England agreed to buy the delayed grapes only at a reduced price, Lozen elected to sell them domestically at lower prices than it would have received under its original contract with the customer in England. A week's delay in arrival of the grapes in England was critical because, by then, cheaper European grapes were expected to "flood the market."
 
 
 6
 Sea-Land filed this action to recover the full amount of its contract with Lozen to transport the containers of grapes. Lozen answered and counterclaimed, arguing that, as a result of Sea-Land's delay in transporting the containers, it suffered damages when it sold its grapes domestically at distressed prices. The parties settled Sea-Land's original claim, and the district court granted a stipulated request for dismissal. However, the parties were unable to reach agreement with respect to Lozen's state-law counterclaim for breach of contract and its federal-law counterclaim for cargo loss and damage pursuant to sections 11706 and 14706 of the Interstate Commerce Act, 49 U.S.C. §§ 11706, 14706. The district court granted Sea-Land's motion for summary judgment with respect to both counterclaims, and Lozen filed a timely notice of appeal.
 
 STANDARDS OF REVIEW
 
 7
 We review de novo the district court's grant of summary judgment. Neptune Orient Lines, Ltd. v. Burlington N. & Santa Fe Ry. Co., 213 F.3d 1118, 1119 (9th Cir.2000). Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court properly applied the relevant law. Amdahl Corp. v. Profit Freight Sys., Inc., 65 F.3d 144, 146 (9th Cir.1995).
 
 
 8
 The district court's interpretation of a statute is a question of law that we review de novo. Silver Sage Partners, Ltd. v. City of Desert Hot Springs, 251 F.3d 814, 819 (9th Cir.2001). We also review de novo the district court's interpretation of the terms of a bill of lading. Yang Ming Marine Transp. Corp. v. Okamoto Freighters Ltd., 259 F.3d 1086, 1095(9th Cir.2001).
 
 
 9
 We review for abuse of discretion evidentiary rulings made in the context of summary judgment. Block v. City of Los Angeles, 253 F.3d 410, 416 (9th Cir.2001). Even when a district court has abused its discretion, however, reversal is appropriate only when the court's error was prejudicial. Tennison v. Circus Circus Enters., Inc., 244 F.3d 684, 688(9th Cir.2001); Fed. R.Evid. 103(a).
 
 DISCUSSION
 A. Jurisdiction
 
 10
 Before addressing the merits, we first must determine whether the district court had subject matter jurisdiction over Lozen's federal and state counterclaims. Herman Family Revocable Trust v. Teddy Bear, 254 F.3d 802, 804(9th Cir.2001). Sea-Land questions the court's jurisdiction, but we conclude that the court had authority to proceed as it did.
 
 
 11
 Lozen filed one of its counterclaims pursuant to sections 11706 and 14706 of the Interstate Commerce Act, commonly called the "Carmack Amendment." 49 U.S.C. §§ 11706, 14706. Because Lozen sought damages in excess of $10,000, the district court had jurisdiction over this claim under 28 U.S.C. § 1337(a). Hunter v. United Van Lines, 746 F.2d 635, 638 (9th Cir.1985). Although Lozen's Carmack Amendment claim turned out to be unsuccessful, it was not "insubstantial," that is, "`absolutely devoid of merit or obviously frivolous.'" Brady v. Brown, 51 F.3d 810, 816 (9th Cir.1995) (quoting Gilder v. PGA Tour, Inc., 936 F.2d 417, 421 (9th Cir. 1991)). Therefore, the district court had jurisdiction over it. Id.
 
 
 12
 The court's original jurisdiction over the Carmack Amendment claim gave it power to exercise supplemental jurisdiction over Lozen's state-law counterclaim. 28 U.S.C. § 1367(a). Because the federal and state counterclaims arise from the same transaction and rely on identical facts for their resolution, they "form part of the same case or controversy under Article III" for the purposes of supplemental jurisdiction. Id. Although the district court could have dismissed Lozen's statelaw claim after dismissing the Carmack Amendment claim, it did not abuse its discretion by choosing to entertain the merits of the state-law claim. 28 U.S.C. § 1367(c); Acri v. Varian Assocs., Inc., 114 F.3d 999, 1000 (9th Cir.1997) (en banc).
 
 B. Terms of the Parties' Agreement
 
 13
 Lozen and Sea-Land dispute the nature of the agreement between them and the terms governing that agreement. Lozen argues that the parties entered into a special oral contract whereby Sea-Land expressly promised to deliver the three containers of grapes by a certain date. Sea-Land, on the other hand, argues that the terms of its international bills of lading constitute the parties' agreement. Those terms provided Sea-Land with some latitude as to the date by which it was required to deliver the three containers. The district court adopted the latter construction of the parties' agreement, and we agree.
 
 
 14
 This dispute arises because Lozen requested that express Sea waybills of lading be used in the transportation of its grapes.[1] Had this been a traditional shipment, documents incorporating the terms on Sea-Land's international bills of lading would have been printed by Sea-Land and given to Lozen. However, express sea waybills are issued electronically, and Sea-Land did not give a printed copy to Lozen.
 
 
 15
 Lozen claims that, when it entered into the shipping agreement, it was unaware that the terms printed on Sea-Land's international bills of lading also typically apply to shipments sent via its electronic sea waybills. Lozen further asserts that, regardless of the terms applicable to other shipments of this type, the parties entered into a special oral agreement with respect to this particular shipment and that Sea-Land expressly guaranteed the date by which the grapes would arrive.
 
 
 16
 Those arguments are unpersuasive on this record. Dean Myring, Lozen's president, twice conceded in his deposition that he could recall no specific details about the formation of the alleged special oral contract. He also admitted that Sea-Land, like other carriers, never guaranteed specific delivery times:
 
 
 17
 They are not guaranteed. In fact—well, if they were guaranteed Sea-Land would be opening themselves up to—any carrier would be opening themselves up to all sorts of fun and games if they put a cast iron guarantee on something.
 
 
 18
 As demonstrated by a fax that he sent to a domestic agent, Myring knew that "the carriers (SeaLand, Maersk, Mitsui, all of them!) have an `out' based on International Shipping regulations and so a week[']s delay is not considered `late'. Moreover, ANY shipping line doesn't totally guarantee a timely delivery, an `ETA' is exactly what it says, an ESTIMATED time of arrival."
 
 
 19
 Myring's deposition also reveals that he had shipped cargo several times before under Sea-Land's traditional bills of lading. In addition, Myring admitted that he had read the reverse side of Sea-Land's bills of lading before initiating the shipment at issue here. Perhaps most importantly, Myring demonstrated his awareness that the terms printed on traditional bills of lading generally apply to express sea waybills:
 
 
 20
 Q: Was it your understanding that when cargo was moving under an express sea way bill that it was still moving under the terms and conditions of Sea-Land's bills of lading?
 
 
 21
 ....
 
 
 22
 A. I think that is a fair statement.
 
 
 23
 This evidence alone justifies a conclusion that the terms printed on Sea-Land's non-electronic bills of lading control the parties' agreement.[2] We have held that "actual possession of the bill of lading" is unnecessary in situations like this one, in which a shipper is "familiar as a matter of commercial practice with the terms and limitations of Sea-Land's bill of lading." Royal Ins. Co. v. Sea-Land Serv. Inc., 50 F.3d 723, 727 (9th Cir.1995); see also Travelers Indem. Co. v. Vessel Sam Houston, 26 F.3d 895, 899 (9th Cir.1994) (holding that a sophisticated shipper who had used the carrier on previous occasions and was familiar with its bill of lading failed to raise a question of material fact as to whether it was denied a fair opportunity to opt out of the liability clause in the bill of lading).
 
 
 24
 Sea-Land submitted other evidence, in addition to the deposition testimony, that Myring had read the terms on Sea-Land's bills of lading and understood that they controlled the parties' agreement. For example, in an e-mail to Sea-Land, Myring wrote: "I understand what's written on the back of your b/l's [bills of lading] and you can't guarantee deliveries due to certain circumstances." Similarly, in an e-mail to Lozen's customer in England, Myring wrote: "Sorry about this but, as Sea-Land have [sic] politely pointed out, read the back of any ocean bill and there is no `guarantee' of delivery date and so for a week's delay there's bugger all that they're going to do about it."
 
 
 25
 In the face of this evidence, Lozen concedes that Sea-Land did not agree to deliver the containers of grapes to England by a certain date but, instead, asserts that Sea-Land promised that the containers would be shipped to New Jersey in time to be loaded on the Maersk. The record does not allow that inference.
 
 
 26
 Sea-Land presented considerable evidence that it did not guarantee that the containers would be delivered to any location by a specific date, that it is not the practice of Sea-Land or other carriers to make such guarantees, and that Lozen knew that the terms on Sea-Land's international bills of lading governed both the inland and oversea legs of the shipment. In response, Lozen presented no evidence that Sea-Land orally guaranteed timely delivery of the grapes to New Jersey but, instead, offered only bare allegations[3] as to the existence of a special agreement. Accordingly, there is no genuine issue of fact as to whether Myring had read Sea-Land's bills of lading and knew that they, rather than an alleged oral "guarantee," governed the parties' agreement.
 
 
 27
 C. Application of COGSA to the Parties' Agreement
 
 
 28
 The district court applied COGSA in its analysis of the extent of Sea-Land's liability. Lozen argues that, instead, the court should have applied either the Carmack Amendment or the Harter Act, 46 U.S.C.App. § 190.
 
 
 29
 COGSA applies to "[e]very bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea to or from ports of the United States, in foreign trade." 46 U.S.C.App. § 1300 (emphasis added). Lozen argues that, because Sea-Land was hired to transport the containers of grapes from Hermosillo, Mexico, to Felixstowe, England, the district court erred in holding that COGSA applies to the shipment. See, e.g., People's Ins. Co. of China v. M/V Damodar Tanabe (In re Damodar Bulk Carriers, Ltd.), 903 F.2d 675, 677 (9th Cir.1990) (finding COGSA inapplicable to a shipment from Chile to China, despite the fact that the ocean carrier made a scheduled stop in Hawaii).
 
 
 30
 Lozen's point is correct but, in the circumstances here, incomplete. Even though COGSA does not apply by its own force to the shipment,[4] Sea-Land's international bills of lading contain a "Clause Paramount"[5] that explicitly incorporates the statute into the contract between the parties. We have repeatedly enforced such clauses. See, e.g., Royal Ins., 50 F.3d at 726-27; Inst. of London Underwriters v. Sea-Land Serv., Inc., 881 F.2d 761, 764-66 (9th Cir.1989). Accordingly, the district court did not err in holding that COGSA applied to the parties' agreement as a matter of contract.
 
 
 31
 The district court also properly concluded that no other statute applied. First, the Carmack Amendment is inapplicable because (as potentially relevant here) that statute determines carrier liability only for "transportation in the United States between a place in ... the United States and another place in the United States through a foreign country; or the United States and a place in a foreign country." 49 U.S.C. § 10501(a)(2)(E), (F);[6] see also id. § 13501. Lozen's containers were to be shipped from Mexico to England. Lozen's citation of Neptune Orient Lines, Ltd. v. Burlington Northern & Santa Fe Railway Co., 213 F.3d 1118 (9th Cir.2000), is therefore inapposite because the goods in that case were shipped from Jakarta, Indonesia, to Memphis, Tennessee.
 
 
 32
 For a similar reason, the Harter Act does not apply to the shipment at issue: "To the extent that the Harter Act governed international trade leaving from or entering American ports, it was superseded in 1936 by the Carriage of Goods by Sea Act.... The Harter Act therefore only governs domestic trade." N. River Ins. Co. v. Fed Sea/Fed Pac Line, 647 F.2d 985, 987 (9th Cir.1981); see also Sunkist Growers, Inc. v. Adelaide Shipping Lines, Ltd., 603 F.2d 1327, 1333-34(9th Cir.1979) ("It is well recognized that The Hague Rules or COGSA have superseded the Harter Act with respect to foreign trade...."). Moreover, because COGSA is incorporated by contract into Sea-Land's bills of lading, "it, rather than the Harter Act, controls." N. River Ins., 647 F.2d at 987.
 
 
 33
 D. "Unreasonable Deviation" and Sea-Land's "Liberty Clauses"
 
 
 34
 Lozen argues that delay caused by CSX, Sea-Land's railroad agent, constituted an unreasonable deviation, which releases Lozen from the terms of Sea-Land's bills of lading. Sea-Land responds that the agent's behavior did not rise to the level of an unreasonable deviation and that, therefore, two "liberty clauses" in its bills of lading protect it from liability.[7]
 
 
 35
 A "deviation" is defined under admiralty law as a " `voluntary departure without necessity, or any reasonable cause, from the regular and usual course' of the voyage." Vision Air Flight Serv., Inc. v. M/V Nat'l Pride, 155 F.3d 1165, 1175-76 n. 12 (9th Cir.1998) (quoting Constable v. Nat'l S.S. Co., 154 U.S. 51, 66, 14 S.Ct. 1062, 38 L.Ed. 903 (1894)). In order for a deviation to be "unreasonable," the carrier must intentionally have caused damage to the shipper's goods. Id. at 1175. Even when a carrier has engaged in "gross negligence or recklessness," such behavior does not constitute an unreasonable deviation. Id.
 
 
 36
 Lozen concedes that the initial misrouting of its containers was an accident and that this error alone did not constitute an unreasonable deviation. See Vistar, S.A. v. M/V Sea-Land Express, 792 F.2d 469, 472 (5th Cir.1986) (holding that there was no unreasonable deviation in the absence of evidence that a truck driver "intentionally and deliberately deviated from the instructed route"). Instead, Lozen argues that CSX's behavior after discovering the error was an unreasonable deviation. It asserts that Sea-Land attempted to minimize the delay caused by the misrouting error, but that CSX deliberately refused to cooperate despite its knowledge of the damaging consequences. According to Lozen, CSX's inaction amounted to intentional causation of damage and, accordingly, constituted an unreasonable deviation.
 
 
 37
 In Exhibit 4, an internal company e-mail,[8] one of Sea-Land's employees admitted:
 
 
 38
 I got with CSX to see if we could get containers taken from the train.... I'm not sure why CSX decided to rail them. Had we been able to truck these units, we could've made the vessel.... [W]e had plenty of time to get these units, had CSX allowed us to get our hands on them as we asked (repeatedly). I kept telling Lisa Tapley that these units were vessel protected loads, and they had to make the vessel. There was no ambiguity in my needs, with regards these units. It comes down to me wanting to truck these units, from Syracuse, as our recovery plan, but CSX, in their infinite wisdom, decided not to allow us to do this. This is totally, and completely a CSX failure.
 
 
 39
 Sea-Land also wrote a letter to Lozen, stating in part:
 
 
 40
 We are very disappointed in the unfortunate delay caused by the rail and our inability to get cooperation from the rail operators. While we did track and trace these reefer loads most diligently, the railroad failed to follow our instructions and deramp the loads so we could truck them the rest of the way to Elizabeth port.
 
 
 41
 Together, these two communications permit a reasonable finder of fact to infer that CSX intentionally caused the damage that Lozen suffered. There is, therefore, a genuine issue of fact as to whether CSX committed an unreasonable deviation.
 
 
 42
 For this reason, the "liberty clauses" in Sea-Land's bills of lading cannot unequivocally insulate the company from liability. Although these provisions are generally enforceable "transship clauses," a liability limitation in a bill of lading is unenforceable to the extent that it authorizes the carrier to engage in an unreasonable deviation. Yang Mach. Tool Co. v. Sea-Land Serv., Inc., 58 F.3d 1350, 1353 (9th Cir.1995). Because there is a genuine issue of fact as to whether Sea-Land's behavior constituted an unreasonable deviation, summary judgment was not appropriate.
 
 E. The District Court's Evidentiary Rulings
 
 43
 Lozen argues that four of the district court's evidentiary rulings were erroneous. We will address each in turn.
 
 1. Natalie Fletcher's Declaration
 
 44
 Lozen first argues that the declaration of Natalie Fletcher, one of Sea-Land's employees, should have been excluded for lack of foundation and lack of personal knowledge.
 
 
 45
 Fletcher states in her declaration that, at all relevant times, she was Sea-Land's Manager in Documentation. She explains that, as part of her duties in that position, she was and is familiar with Sea-Land's express sea waybills of lading and Sea-Land's international bills of lading. She also states that she has personal knowledge of all matters discussed in her declaration.
 
 
 46
 These statements provide sufficient foundation for Fletcher's declaration and demonstrate personal knowledge on her part. See, e.g., Barthelemy v. Air Lines Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir. 1990) (per curiam) (inferring personal knowledge from affidavits). Accordingly, the district court did not abuse its discretion by admitting Fletcher's declaration.
 
 2. Sea-Land's Bills of Lading
 
 47
 We next hold that the district court properly admitted Sea-Land's bills of lading. These documents were attached as exhibits to Fletcher's declaration and were admitted pursuant to the business records exception to the hearsay rule, Fed. R.Evid. 803(6). Lozen argues that the bills of lading cannot qualify for this exception and that, even if they could, Fletcher's declaration does not "address the necessary elements for a document to fall within the business records exception to the hearsay rule." We disagree.
 
 
 48
 The bills of lading are business records. Rule 803(6) allows the admission of business records when "two foundational facts are proved: (1) the writing is made or transmitted by a person with knowledge at or near the time of the incident recorded, and (2) the record is kept in the course of regularly conducted business activity." United States v. Miller, 771 F.2d 1219, 1237 (9th Cir.1985).
 
 
 49
 The first element of that test is met here because, although the physical documents were not generated when the parties contracted for the shipment of Lozen's grapes,[9] they were produced from the same electronic information that was generated contemporaneously. For the purposes of Rule 803(6), "it is immaterial that the business record is maintained in a computer rather than in company books." United States v. Catabran, 836 F.2d 453, 457 (9th Cir.1988) (citation and internal quotation marks omitted). Rule 803(6) allows for the admission of a "data compilation, in any form," so long as the compilation meets the requirements of the rule. Id.
 
 
 50
 Likewise, the second element of the test is met, because the information on the bills of lading is kept in the course of Sea-Land's regularly conducted business activity. The bills of lading are those that would have been issued in the regular course of Sea-Land's business had Lozen not requested that the transaction be performed electronically.
 
 
 51
 Not only are the bills of lading business records, but Fletcher's declaration addresses the necessary elements to establish the hearsay exception. As the district court explained, "Fletcher, as a Manager in Documentation at Sea-Land, has sufficient knowledge to testify that the exhibits did in fact contain the true and correct terms and conditions of Sea-Land's bills of lading." Thus, she was a "qualified witness" within the meaning of Rule 803(6). See Miller, 771 F.2d at 1237 (holding that the foundational facts for the hearsay exception "must be proved through the testimony of the custodian of the records or other qualified witness, though not necessarily the declarant"). In her declaration, Fletcher explains in detail Sea-Land's regular business procedures regarding the use of express sea waybills of lading, thus establishing that the exhibits satisfy both elements of the business records test.
 
 3. Dean Myring's Declaration[10]
 
 52
 Lozen argues that the district court abused its discretion by refusing to admit Dean Myring's declaration. Although the district court's reason for excluding the declaration was inapposite, Lozen suffered no prejudice from the court's ruling.
 
 
 53
 Lozen correctly notes that the statements in Myring's declaration supplemented, and did not directly contradict, his deposition statements.[11] Accordingly, the district court erred in excluding the declaration on the ground that it contradicted Myring's deposition testimony. See Doe v. Cutter Biological, Inc., 971 F.2d 375, 386 (9th Cir.1992) (holding that, where a witness' affidavit and deposition testimony were not in direct conflict, the district court erred in excluding the affidavit). However, Lozen was not prejudiced by the exclusion of the declaration. Nothing in it gives rise to a genuine issue of material fact.
 
 
 54
 Myring does not claim in his declaration that he was unfamiliar with the terms printed on Sea-Land's bills of lading. To the contrary, he reaffirms that he had read those terms before entering into the contract at issue here. Similarly, Myring does not repudiate his concessions that no carrier guarantees delivery times and that Sea-Land could not be held responsible for a week's delay. Nor does the declaration bring to light any fact tending to support Lozen's claim that the parties entered into a special oral contract in which Sea-Land agreed to deliver the grapes to New Jersey by a certain date. Accordingly, the admission of Myring's declaration could not have given rise to a genuine issue of material fact and, therefore, Lozen was not prejudiced by its exclusion.
 
 4. Exhibit 4: Sea-Land's E-mail
 
 55
 Finally, Lozen contends that the district court improperly excluded Exhibit 4, an internal company e-mail authored by one Sea-Land employee and forwarded to Lozen by a second Sea-Land employee. The district court excluded this evidence on the ground that Lozen "makes no argument, nor does it present any evidence indicating the identity or job title of [the] employee" who authored the forwarded e-mail. Lozen argues that the e-mail is admissible and is not hearsay because it is an admission by a party opponent. Fed. R.Evid. 801(d)(2)(D).
 
 
 56
 Federal Rule of Evidence 801(d)(2)(D) provides that a statement is not hearsay if it is offered against a party and is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." This rule "requires the proffering party to lay a foundation to show that an otherwise excludable statement relates to a matter within the scope of the agent's employment." Harris v. Itzhaki, 183 F.3d 1043, 1054 (9th Cir.1999) (citing Breneman v. Kennecott Corp., 799 F.2d 470, 473 (9th Cir.1986)); see also United States v. Chang, 207 F.3d 1169, 1176 (9th Cir.) (explaining that a party proffering evidence pursuant to Rule 801(d)(2)(D) bears the burden of establishing an adequate foundation), cert. denied, 531 U.S. 860, 121 S.Ct. 148, 148 L.Ed.2d 98 (2000). When a court is evaluating whether such a foundation has been established, "[t]he contents of the statement shall be considered but are not alone sufficient to establish ... the agency or employment relationship and scope thereof." Fed.R.Evid. 801(d)(2).
 
 
 57
 Exhibit 4 is an admission by a party opponent. The original e-mail, an internal company memorandum, closes with an electronic "signature" attesting that the message was authored by "Mike Jacques," Sea-Land's "Rail Reefer Services Coordinator" at the time the e-mail was written. Jacques is listed as one of Sea-Land's employees in Exhibit 9, a letter from Sea-Land to Lozen that the district court did admit into evidence. The original e-mail also appears to concern a matter within the scope of Jacques' employment.
 
 
 58
 More importantly, however, Jacques' original e-mail was forwarded to Lozen by Laurie Martinez, a second Sea-Land employee. She copied the entire body of Jacques' internal memorandum into her e-mail and prefaced it with the statement, "Yikes, Pls note the rail screwed us up...." Martinez thereby incorporated and adopted the contents of Jacques' original message, because her remark "manifested an adoption or belief in [the] truth" of the information contained in the original e-mail. Fed.R.Evid. 801(d)(2)(B)(providing that adoptive admissions by a party are not hearsay); see also 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 801.31[3][b], at 801 56(Joseph M. Laughlin ed., 2d ed. 2002) ("A party may adopt a written statement if the party uses the statement or takes action in compliance [with] the statement."); cf. Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1005 n. 6 (3d Cir.1994) (holding that statements of company president, which were reprinted in company publications, were not hearsay but were instead admissible as adoptive admissions). Further, there is evidence in the record that Martinez was one of Sea-Land's employees at the time her message was written and that the contents of the e-mail were within the scope of her employment. Her admission (including the incorporated portion) therefore conforms to the requirements of Rule 801(d)(2)(D).
 
 
 59
 For these reasons, the district court abused its discretion when it excluded the e-mail. Lozen suffered prejudice because Exhibit 4 tends to show that Sea-Land's railroad agent committed an unreasonable deviation and thus creates an issue of fact on that issue.
 
 
 60
 REVERSED and REMANDED for proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The parties and the district court refer to these documents interchangeably as "express sea waybills of lading" and "express seaway bills of lading." For the sake of simplicity, we adopt the former
 
 
 [2]
 The evidence in the record demonstrates that both parties understood that the terms on Sea-Land's non-electronic bills of lading controlled the shipment of the grapes in this case. Therefore, we need not decide whether the terms of a traditional bill of lading control all shipments sent via electronic express sea waybills
 
 
 [3]
 Lozen attempted to introduce a declaration in which Myring sought to retract one of his earlier admissions. However, as discussed in Section D.3 below, the district court properly ruled that this declaration alone could not create a genuine issue of fact as to the nature and terms of the parties' agreement
 
 
 [4]
 We express no opinion as to whether COGSA would have applied by its own force to the electronic sea waybill had thisnot been a foreign-to-foreign shipment. Whether COGSA applies to electronic shipping documents appears to be an open question. See, e.g., Leslie W. Taylor, Proposed Changes to the Carriage of Goods by Sea Act: How Will They Affect the United States Maritime Industry at the Global Level?, VIII (No. 2) Currents: Int'l Trade L.J. 32, 35 (Winter 1999) ("With the introduction of electronic data exchange and other paperless transactions, there is uncertainty as to whether the current COGSA would include these materials as a bill of lading."); Emmanuel T. Laryea, Paperless Shipping Documents: An Australian Perspective, 25 Tul. Mar. L.J. 255, 264-65 (2000) (noting that electronic sea waybills may not be subject to statutes governing paper shipping documents).
 
 
 [5]
 This clause states, in relevant part:
 This bill of lading shall have effect subject to all the provisions of the Carriage of Goods by Sea Act of the United States of America, approved April 16, 1936, as if set forth herein.
 
 
 [6]
 The full text of 49 U.S.C. § 10501(a)(2) states that the Carmack Amendment applies only to transportation in the United States between a place in —
 (A) a State and a place in the same or another State as part of the interstate rail network;
 (B) a State and a place in a territory or possession of the United States;
 (C) a territory or possession of the United States and a place in another such territory or possession;
 (D) a territory or possession of the United States and another place in the same territory or possession;
 (E) the United States and another place in the United States through a foreign country; or
 (F) the United States and a place in a foreign country.
 
 
 [7]
 Clauses Three and Four are the "liberty clauses." Clause Three in Sea-Land's bills of lading states: "Carrier shall have the right, without notice, to substitute or employ a vessel, watercraft, or other means rather than the vessel named herein to perform all or part of the carriage." Clause Four states: "Goods shut out or not loaded on a vessel for any reason can be forwarded on a subsequent vessel or by feederships, lighters, aircraft, trucks, trains or other means in addition to the ocean vessel, or its substitute, to accomplish the carriage herein."
 
 
 [8]
 The district court erred in excluding Exhibit 4, for the reasons explained in Section E.4 below
 
 
 [9]
 Exhibits 1185 and 1186 were produced on June 27, 1999, a day before the containers were to have arrived in England
 
 
 [10]
 Myring submitted two declarations. The district court did not differentiate between the two of them, nor did the parties do so in their briefs. This point is immaterial, however, as neither gives rise to a genuine issue of material fact. We therefore refer to both declarations collectively as "Myring's declaration."
 
 
 [11]
 The only exception is Myring's claim that "I was never aware that [Sea-Land] contended that the terms and conditions on the back of the International Bill of Lading form as they appear on Sea-Land's Exhibits 1185 and 1186 apply to the express sea waybill shipments." That statement does not raise a genuine issue of material fact, however, because a party cannot avoid summary judgment "merely by contradicting his or her own sworn deposition testimony with a later declaration."Disc Golf Ass'n v. Champion Discs, Inc., 158 F.3d 1002, 1008 (9th Cir.1998).