**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHRISTOPHER ARMONDO TORTU,
   *Plaintiff-Appellant,*

v.

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT; BILL YOUNG, in his
official capacity as Sheriff of the
Las Vegas Metropolitan Police
Department; RICHARD CASHTON,
individually and in his official
capacity as a Police Officer of the
Las Vegas Metropolitan Police
Department; EUGENE L. ENGLE,
individually and in his official
capacity as a Police Officer of the
Las Vegas Metropolitan Police
Department; DUANE COWLEY,
individually and in his official
capacity as a Police Officer of the
Las Vegas Metropolitan Police
Department; ALBERT REEDER,
individually and in his official
capacity as a Police Officer of the
Las Vegas Metropolitan Police
Department; JULIUS PRATOR,
individually and in his official
capacity as a Police Officer of the
Las Vegas Metropolitan Police
Department,
   *Defendants-Appellees.*

No. 06-16663

D.C. No.
CV-03-00783-RCJ

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert C. Jones, District Judge, Presiding

Argued and Submitted
May 12, 2008—San Francisco, California

Filed March 3, 2009

Before: Procter Hug, Jr., Andrew J. Kleinfeld, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Hug;
Partial Concurrence and Partial Dissent by Judge N. Smith

## COUNSEL

Paola M. Armeni and Dominic P. Gentile, Gordon & Silver, Ltd., Las Vegas, Nevada, for the appellant.

Thomas D. Dillard, Jr. and Peter M. Angulo, Olson, Cannon, Gormley & Desruisseaux, Las Vegas, Nevada, for the appellees.

**OPINION**

HUG, Circuit Judge:

Christopher Tortu appeals the district court's order granting defendant Officer Eugene Engle's motion for judgment as a matter of law and, in the alternative, his motion for a new trial. After the jury returned a verdict in favor of Officers Richard Cashton and Duane Cowley but finding Engle liable, the district court granted Engle's Fed. R. Civ. P. 50(b) motion for judgment as a matter of law and, alternatively, his Rule 59 motion for a new trial. However, neither Engle nor the other two officers filed a Rule 50(a) motion for judgment as a matter of law. Tortu claims this procedural error should have prevented Engle from filing a Rule 50(b) motion, and further claims the district court abused its discretion when it granted Engle's motion for a new trial. Alternatively, Tortu argues the district court erroneously found Engle protected by qualified immunity.

We have jurisdiction pursuant to 28 U.S.C. § 1291 and hold that the district court should not have entertained Engle's Rule 50(b) motion because he failed to file a Rule 50(a) motion, which must be filed before a court can consider a Rule 50(b) motion. We also conclude the district court abused its discretion when it granted Engle's Rule 59 motion for a new trial because the verdict was not against the clear weight of the evidence. For the reasons discussed below, we reverse the district court and remand with instructions to reinstate the jury's verdict and enter judgment accordingly.

## I.   Factual and Procedural Background

This case arises out of Christopher Tortu's arrest at the McCarran International Airport in Las Vegas, Nevada on July 9, 2001. After filing his complaint seeking redress for the alleged unreasonable force applied by the officers, the district court granted defendants' partial motion for summary judg-

ment and dismissed many of Tortu's claims. The case then proceeded to trial on the only issue remaining: whether Officers Richard Cashton, Duane Cowley, and Eugene Engle used excessive force while arresting Tortu.

## A.  Trial Proceedings

During trial, both parties presented widely divergent accounts of the events that transpired during Tortu's arrest. In its post-trial order, the district court heavily relied on these vast differences in testimony as well as the significant amount of testimony from the officers and their witnesses to grant Engle's post-trial motions. Accordingly, we provide a summary of the testimony presented at trial and include each party's account of the events when the two versions substantially differed. To better understand the jury's verdict, we separate the events into three acts: (1) the incident in the terminal, (2) the incident in the jetway, and (3) the incidents on the tarmac and in the police SUV.

## 1.  The Terminal

Tortu, along with his traveling companion Kiley Fox, arrived at the airport early for their Southwest Airlines flight to Los Angeles. While playing video poker and waiting for the plane, Tortu misplaced their tickets. The tickets were discovered by an airport employee and turned in at the security checkpoint. Fox left to retrieve the tickets at the security checkpoint where the tickets were being held.[1] As Fox was retrieving the tickets, the gate agent closed the jetway door and Tortu went up to the agent and asked to board the plane. The gate agent told him he could not board the plane without a ticket. Disregarding this instruction, Tortu followed the agent and boarded the plane as the agent led another passenger down the jetway.

---

[1]At this Las Vegas airport, the checkpoint is a considerable distance from the boarding gates and requires a tram ride.

Once on the plane, the Southwest employees asked him to leave because he had no ticket. He refused. A Southwest official then called the police, and an officer escorted Tortu off the plane. As he was exiting the jetway, Tortu yelled at a Southwest manager and angrily walked away from the gate.

The officers at the scene walked toward Tortu and asked him to stop walking away. Once he finally stopped, Tortu and the officers engaged in a verbal altercation that grew in severity. Tortu testified that at least three officers then jumped him from behind and handcuffed him. The officers, however, stated that Tortu forcibly resisted their questioning and arrest attempt, requiring the officers to force Tortu onto the ground to handcuff him. Tortu contended that, after securing the handcuffs, the officers continuously beat him—a claim the officers denied. The three defendant officers, Cashton, Cowley and Engle, then took Tortu to an empty jetway.

## 2.   The Jetway

Once in the jetway, the officers testified that Tortu became combative and fought them as they led him down the jetway. Tortu, however, claimed the officers continuously roughed him up while bringing him down the jetway. Specifically, Tortu stated they stuck him in a luggage-sizing bin at the end of the jetway and beat him. Tortu claimed these beatings were so severe that, while punching him, Officer Cashton's pectoral muscle detached from the bone and tore his rotator cuff. The officers denied beating Tortu and testified that these injuries occurred when Tortu lowered his shoulder into Cashton, slamming him into the jetway wall. Three Southwest employees observed the actions in the jetway and substantiated the defendants' contentions.

The officers then led Tortu down the jetway stairs and onto the tarmac. While the officers brought Tortu down the stairs, they testified he was very disruptive and stuck his feet between the steps, purposefully impeding their progress.

Tortu, however, claimed the officers forcibly dragged him down the staircase.

### 3.    The Tarmac and Police SUV

Once on the tarmac, Tortu testified that the officers threw him to the ground and Officer Engle punched him in the back of the head, bruising and cutting Engle's hand. Engle, in contrast, testified that Tortu caused these hand injuries during the scuffle in the jetway.

After being thrown on the ground, Tortu testified that the officers threw him on the hood of the police SUV and forced him into the back seat of the SUV. With Tortu still handcuffed, the officers sat him between Officers Cashton and Cowley in the back seat. Tortu testified that Officer Engle then reached back between the two front seats and squeezed Tortu's testicles as hard as he could for about ten seconds. Tortu stated the pain was so severe that he could not breathe. All three officers denied squeezing or in any way intentionally harming Tortu's testicles. After this final incident, Engle drove Tortu, along with Cashton and Cowley, to the airport police substation and then on to the Clark County Detention Center. The Southwest employees did not observe the incidents on the tarmac or in the vehicle.

### 4.    Medical Evidence of Tortu's Injuries

At trial, Tortu presented significant medical evidence of his injuries from these events including testimony of examining doctors.

The day after Tortu got out of jail, he visited a primary care physician to examine his injuries. The doctor noted that the left side of Tortu's face was swollen with bruises, he had a lump on the back of his head and also large bruises on the side of his body. The doctor then examined Tortu's testicles and found them very swollen, tender, and bruised. During this

examination, Tortu complained of exceptional pain when the doctor touched his testicles. The doctor ordered an ultrasound, which indicated blood in the testes. Because of this test result and the rest of Tortu's injuries, the doctor referred Tortu to a urologist, a neurologist, and an orthopedic surgeon. The medical bills from these visits totaled nearly $4400.

Eleven days after the incident, the urologist's exam revealed a hematoma in Tortu's scrotum, a significant bruise on the scrotal skin, and tenderness along the spermatic cords on both sides of his testicles. The urologist further noted Tortu experienced extreme pain and tenderness when he touched Tortu's testicles. The urologist testified that squeezing Tortu's testicles could have led to these testicular and scrotal injuries.

### 5.    *Jury Instructions and Verdict*

After four days of trial, the judge and counsel for the parties discussed the proposed jury instructions. The defendants offered a proposed jury instruction on qualified immunity. The judge refused the instruction. He explained his reason as follows:

> I don't think it's appropriate to give this [qualified immunity] instruction here. It's a matter for the Court if the jury concludes and comes back with a finding of liability. You're at liberty, either in the context of a motion for new trial or motion for judgment notwithstanding, to argue that th[e] second prong . . . has not been met by the plaintiff; that is, even though the jury found unreasonable use of force, that's the factual issue, it would be reasonable for an officer to conclude that the use of a strike to the groin in counteracting a resistance to arrest was a reasonable misinterpretation under the current case law. . . . [T]herefore, I've stricken this instruction and believe that the more appropriate place is either

in a motion for summary judgment up front or in a motion for judgment notwithstanding or otherwise.

The judge later added that qualified immunity is "a legal question that the jury just shouldn't answer." Both parties agree that the qualified immunity determination is an issue of law for the judge.

Engle argues these statements and indications by Judge Jones directed the officers not to file a Rule 50(a) motion for judgment as a matter of law before the case was submitted to the jury. Engle contends the judge led the officers to believe that he did not want and would not require them to file the Rule 50(a) motion. Therefore, none of the officers filed a Rule 50(a) motion before the matter was submitted to the jury.

After receiving instructions and deliberating for a few hours, the jury returned a verdict finding Cashton and Cowley not liable, but finding Engle liable. The jury was not provided with special interrogatories. It only answered the question of whether each officer was liable and, if so, the amount of damages. The jury awarded Tortu $175,000 in compensatory damages and $5,000 in punitive damages.

## B. Post-Verdict Proceedings

After the verdict, Engle filed a Rule 50(b) motion for judgment as a matter of law and, in the alternative, a Rule 59 motion for a new trial. The district court entertained the Rule 50(b) motion despite not having received a Rule 50(a) motion before the court submitted the case to the jury. The district court then granted the Rule 50(b) motion and, alternatively, the motion for a new trial.

### 1. The Rule 50(b) Motion for Judgment as a Matter of Law

In its post-trial order, the district court stated that it "indicated at trial that it would consider the qualified immunity

defense, if necessary, after trial since it necessitates a legal determination." The district court then considered Engle's motions and found him entitled to judgment as a matter of law because "(1) the jury reached an unreasonable conclusion, and (2) Officer Engle is protected by qualified immunity in this case."

In its discussion granting qualified immunity to Engle, the district court noted that it had declined to address this issue until after the jury rendered its verdict. After conducting an analysis under *Saucier v. Katz*, 533 U.S. 194 (2001), the district court found Engle protected by qualified immunity because his actions were reasonable while he acted under his authority as a law enforcement officer.

### 2. *The Rule 59 Motion for a New Trial*

The district court also granted Engle's alternative motion for a new trial. In granting this motion, the district court again cited an unreasonable jury verdict that was against the clear weight of the evidence, as well as the court's finding that Engle was protected by qualified immunity. The district court also found that the jury awarded excessive damages to Tortu. The district court did not provide for a remittitur in lieu of a new trial, but just granted Engle's Rule 59 motion for new trial. Tortu timely filed this appeal.

### II. *Analysis*

### A. *Rule 50(b) Motion for Judgment as a Matter of Law*

Tortu first contends the district court improperly entertained and granted Engle's Rule 50(b) motion for judgment as a matter of law. We review the district court's grant of a motion for judgment as a matter of law *de novo*. *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007).

Tortu's appeal requires us to address the procedural requirements of Rule 50 of the Federal Rules of Civil Proce-

dure. In particular, Rule 50 requires a party seeking judgment as a matter of law to file a Rule 50(a) motion at any time before the case is submitted to the jury. If the jury later returns a verdict against the moving party, this party may then file a Rule 50(b) motion for judgment as a matter of law.

**[1]** To explain these procedural requirements in greater detail, we begin with the plain language of Rule 50(b):

> **(b) Renewing the Motion After Trial; Alternative Motion for a New Trial.** If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 10 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 10 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.

Fed. R. Civ. P. 50(b). As explicitly stated in the Rule, a Rule 50(b) motion may be considered only if a Rule 50(a) motion for judgment as a matter of law has been previously made. Further, the advisory committee notes to Rule 50 explicitly emphasized this requirement in the 1963 amendments: "A motion for judgment notwithstanding the verdict *will not lie unless it was preceded by a motion for a directed verdict* made at the close of all the evidence."[2] Fed. R. Civ. P. 50 advisory committee's note on 1963 amendments (emphasis added). Later, the notes to the 1991 amendments reiterated this requirement. "This provision retains the concept of the

---

[2]The terms "judgment notwithstanding the verdict" and "directed verdict" have now been combined and simply termed "judgment as a matter of law."

former rule that the post-verdict motion is a renewal of an earlier motion made at the close of the evidence. . . . A post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion." Fed. R. Civ. P. 50 advisory committee's note on 1991 amendments. The Rule itself, as well as these amendments, explicitly require a previous motion to be made before submission to the jury.

**[2]** As Rule 50 and its notes clearly instruct, we strictly construe the procedural requirement of filing a Rule 50(a) motion before filing a Rule 50(b) motion. *Janes v. Wal-Mart Stores Inc.*, 279 F.3d 883, 887 (9th Cir. 2002); *see also Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212 (9th Cir. 1997) ("We strictly adhere to the requirements of Rule 50(b), which prohibit a party from moving for a judgment as a matter of law after the jury's verdict unless that motion was first presented at the close of evidence.") (citation omitted).[3] Fed. R. Civ. P. 50(a)(2) states that:

> A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

Although Engle admits that he failed to file a Rule 50(a) motion, he argues that the rule "is not one of technical precision" and must be "interpreted according to its underlying purposes." Engle's contentions here parallel the unsuccessful arguments of Wal-Mart in *Janes*. In *Janes*, Wal-Mart failed to move for judgment as a matter of law but argued that its motion for summary judgment and trial brief satisfied the requirements for a Rule 50(a) motion. *Janes*, 279 F.3d at 886-87. We disagreed and held the trial brief and summary judgment motion were insufficient to establish a proper motion

---

[3]This requirement has since been clarified to mean before submission to the jury. *See infra* note 4.

and that "substantial compliance is not enough." *Id.* at 887. Wal-Mart's failure to file a Rule 50(a) motion therefore prohibited the district court from entertaining its Rule 50(b) motion.

[3] Here, Engle similarly urges that his motions made pretrial and during trial should suffice for a Rule 50(a) motion. We fail to see a rational distinction from *Janes*. Engle committed the error of failing to file a Rule 50(a) motion just as Wal-Mart did. Accordingly, we conclude that Engle's other motions do not compensate for his failure to file a Rule 50(a) motion.

Engle next argues that he fits an exception to the requirement of filing a Rule 50(a) motion at the close of the case, which allows a Rule 50(b) motion to be considered when an earlier motion has been taken under advisement by the trial judge. This exception, however, is carved out of a "strictly observed" requirement that counsel properly follow Rule 50 procedures. *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1346 (9th Cir. 1985).

Our decision in *Farley* only created an exception to the requirement that the motion be made at the close of the evidence—an exception adopted by and added into the Rule by the 2006 Amendments.[4] Fed. R. Civ. P. 50 advisory com-

---

[4]The note to the 2006 Amendments states, in pertinent part:

> Rule 50(b) is amended to permit renewal of any Rule 50(a) motion for judgment as a matter of law, deleting the requirement that a motion be made at the close of all the evidence. Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion. . . .

> This change responds to many decisions that have begun to move away from requiring a motion for judgment as a matter of law at the literal close of all the evidence. . . . The courts are slowly working away from the formal requirement.

Fed. R. Civ. P. 50 advisory committee's note on 2006 amendments.

mittee's note on 2006 amendments; *Farley*, 786 F.2d at 1346. Although the motion is no longer required to be made at the close of the evidence, a motion must be made before the judge submits the case to the jury. Failing to make a Rule 50(a) motion before the case is submitted to the jury forecloses the possibility of considering a Rule 50(b) motion. Simply put, *Farley* still requires the filing of a 50(a) motion. *See Farley*, 786 F.2d at 1345-47; *Janes*, 279 F.3d at 886-88. Engle's failure to do so defeats his argument.

Finally, Engle asserts that the district court induced him not to file the 50(a) motion. This argument relies on the district court's statement that qualified immunity should only be argued if the jury returned a verdict against Engle or one of the other defendants. *See supra* Part I.A.5, p. 2468-69. Engle contends that this statement constituted an instruction not to file a Rule 50(a) motion and therefore created an exception to the requirement of filing a Rule 50(a) motion.

This argument is without merit. The district court denied Engle's request for a jury instruction because it determined that qualified immunity was to be decided by the court as a matter of law, not to absolve Engle of the procedural obligation to file a Rule 50(a) motion. While the court did indicate that Engle was at liberty in the context of a motion for judgment as a matter of law to argue that he was entitled to qualified immunity, it did not specify how that issue could properly be brought before the court. Engle could have filed a Rule 50(a) motion at that time because it was before the matter had been submitted to the jury. Instead, he disregarded the Rule's clear requirements and did not file the motion.

**[4]** This failure to file a Rule 50(a) motion precludes consideration of a Rule 50(b) motion for judgment as a matter of law. We hold that the district court should not have considered Engle's Rule 50(b) motion because it was procedurally foreclosed by Engle's failure to file a Rule 50(a) motion. When a qualified immunity claim cannot be resolved before

trial due to a factual conflict, it is a litigant's responsibility to preserve the legal issue for determination after the jury resolves the factual conflict. A Rule 50(a) motion meets this requirement.

### B.    Rule 59 Motion for a New Trial

Tortu also argues that the district court improperly granted Engle's alternate Rule 59 motion for a new trial. We review the district court's grant of a new trial for an abuse of discretion. *Union Oil Co. of Cal. v. Terrible Herbst, Inc.*, 331 F.3d 735, 742 (9th Cir. 2003). "The trial court may grant a new trial only if the jury's verdict was against the clear weight of the evidence." *Id.* We may conclude that the district court abused its discretion if the jury's verdict is not against the clear weight of the evidence. *Id.* As the district court concluded that Engle was entitled to a new trial on three distinct bases, we address each basis separately.

### 1.    Unreasonable Jury Verdict

The district court based its decision that the jury's verdict was against the clear weight of the evidence largely on the ground that its verdict for Officers Cashton and Cowley was inconsistent with a verdict against Officer Engle. The court stated that "by finding that Officers Cashton and Cowley did not use unreasonable force, the jury concluded that Plaintiff was lying at least about (1) the events in the terminal at the time of the arrest . . . , (2) the beating in the jetway . . ., and (3) the kidney punches delivered after the officers threw Plaintiff over the hood of the police vehicle."

**[5]** Contrary to the district court's view, the jury verdict only demonstrates that Tortu did not bear his burden of proof by a preponderance of the evidence that all of the officers used excessive force in effecting the arrest. As we have pointed out, the record contains conflicting accounts of the type of force used by all of the officers at various stages of

the arrest and Tortu's level of resistance throughout the process. From the verdict, we cannot say the jury found that either Tortu's or the officers' version of the events involving all the defendants was truthful or correct, as there were no special interrogatories.

**[6]** As to Officer Engle, there was separate evidence of his excessive use of force, principally involving his squeezing of Tortu's testicles for ten seconds while Tortu was handcuffed and seated in the police car. Though the defendants, and an additional officer at the scene, denied that the testicle squeezing occurred, the medical evidence showed definite injury to the testicles for which Engle afforded no explanation. Dr. Debellis, who examined Tortu after he got out of jail, palpated Tortu's testicles and found that they were swollen, tender, and bruised and that Tortu complained of severe pain during the palpation. The doctor ordered an ultrasound and the results indicated blood in the testicles. Dr. Debellis sent Tortu to Dr. Zapinsky, a urologist. Dr. Zapinsky found hematoma of the scrotum, tenderness along the spermatic cords, and that the testicles were quite tender to the touch.

The jury's verdict is also supported by parsing the events of Tortu's arrest into three segments: the terminal, the jetway, and the tarmac/SUV. In the first two segments (the terminal and the jetway), the officers presented significant evidence that Tortu violently protested being arrested. Notably, this evidence consisted of testimony from non-parties that was consistent with the officers' testimony.

The third segment involved testimony from the parties and one deputy, who showed up on the scene. The medical evidence presented at trial, however, provided irrefutable evidence that there had been injury to the testicles. Engle offered no alternative explanation as to how Tortu's injury may have occurred other than Engle's squeezing of Tortu's testicles.[5]

---

[5]Although the district court cited some evidence that the configuration of the police car would have made it impossible for Engle to have reached

**[7]** In finding the jury's decision mistaken and ungrounded, the district court took its own view of the medical evidence in place of the jury's—an impermissible practice. *See Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001). In its order, the district court noted that it did not believe Tortu suffered significant injuries because he did not return for follow-up visits. While the district court may view the case in this light, the jury, on the basis of reasonable evidence, viewed the facts in a different light. The district court cannot substitute its "evaluations for those of the jurors." *Terrible Herbst, Inc.*, 331 F.3d at 743; *see also Silver Sage Partners, Ltd.*, 251 F.3d at 819 ("[A] district court may not grant a new trial simply because it would have arrived at a different verdict."). Here, the district court did that when it discounted Tortu's medical evidence. We conclude that the jury's verdict on the issue of liability is not against the clear weight of the evidence.[6]

---

Tortu's testicles, the jury's finding to the contrary was also not against the clear weight of the evidence, especially because it is clear there was serious injury to the testicles that was otherwise unexplained.

[6] The dissent relies upon the district court's rationale that the jury could not have reached its verdict against Engle alone unless the jury believed all of the officers' stories except what happened on the tarmac and in the SUV. *See infra*, pp. 2484-85. The vital evidence upon which the jury obviously relied is the squeezing of Tortu's testicles in the SUV. This evidence is very distinct from the conflicting evidence as to the beatings and resistance to arrest in the airport, in the jetway, and on the tarmac. The jury did not have to decide that it believed Tortu or Officers Cashton or Crowley on these issues. The only finding necessary was that Tortu did not carry his burden of proof in showing that the officers' force was excessive in light of his resistance.

No testimony or other evidence indicates that Tortu was resisting arrest at the time of the testicle squeezing. He was handcuffed and seated in the rear seat of the SUV between two police officers. Tortu testified that Engle reached back and squeezed his testicles for ten seconds. The injury to the testicles was well supported by medical evidence. Engle offered no evidence of how else that injury could have occurred. The jury's finding on that distinct issue was not against the clear weight of the evidence.

## 2. *Qualified Immunity*

In *Pearson v. Callahan*, 555 U.S. ___, No. 07-751 (Jan. 21, 2009), the Supreme Court revisited its discussion of qualified immunity in *Saucier v. Katz*, 533 U.S. 194 (2001). The Court in *Pearson* succinctly summarized as follows the requirements necessary for government officials to establish qualified immunity:

> In *Saucier*, this Court mandated a two-step sequence for resolving government officials' qualified immunity claims. First, a court must decide whether the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.

Slip op. at 6 (citations omitted).[7] The Court "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Id.* (quotation marks omitted). In this case, there was no attempt to resolve the immunity issue at the Rule 12(b)(6) dismissal stage or at the Rule 56 summary judgment stage. As we have discussed, no proper motion was made at the Rule 50 stage to resolve the issue as a matter of law.[8]

---

[7]*Pearson* only modified *Saucier* on procedural grounds. Whereas *Saucier* set forth a mandatory requirement that step one be considered before step two, 533 U.S. at 200, the *Pearson* Court held that this sequence is no longer a mandatory, inflexible requirement. Slip op. at 10. Indeed, the Court provided several situations in which following the *Saucier* sequence is not advisable. *Id.* at 11-17.

[8]In the case cited by the dissent, *Torres v. City of Los Angeles*, 548 F.3d 1197 (9th Cir. 2008), the issue of qualified immunity was also not brought at an early stage in the litigation; however, the defendants' properly made a Rule 50(a) motion before the jury verdict, and the court then resolved the issue of immunity as a matter of law. *Id.* at 1210-11.

**[8]** In applying the Supreme Court authority, we conclude that a qualified immunity analysis consists of two steps. The first step analyzes whether a constitutional right was violated, which is a question of fact. The second examines whether the right was clearly established, which is a question of law. Step two serves the aim of refining the legal standard and is solely a question of law for the judge. *Saucier*, 533 U.S. at 201. The district court recognized this principle in declining a jury instruction on this issue. As a question of law, the second part of this analysis, when brought at this late stage, is an issue for a judgment as a matter of law under Rule 50(a) and (b), which was not properly brought before the court. This legal matter cannot be appropriately considered on a motion for a new trial, where the issue is whether the jury's verdict is against the clear weight of the evidence.[9]

### 3.   Excessive Damages

The district court's other basis for a new trial was that the "jury awarded speculative, excessive damages unsupported by the evidence." We review a district court order granting a new trial because of excessive damages for an abuse of discretion. *Simpson v. Union Oil Co. of Cal.*, 411 F.2d 897, 907-08 (9th Cir. 1969), *rev'd on other grounds*, 396 U.S. 13 (1969); *see also* 11 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2820, p. 219 (2d ed. 1995).

---

[9]The dissent contends that a new trial can properly be granted on the independent ground of qualified immunity. The determination of qualified immunity at step two is strictly a legal question of whether, even though the facts alleged by the plaintiff make out a constitutional violation, that constitutional right was not clearly established. That issue could have been raised by a motion under Rule 50(a), as was done in *Torres*, 548 F.3d at 1210. However, without the requisite Rule 50(a) motion, this purely legal issue could not be revived under Rule 50(b). There is no authority that this legal issue could be revived as a ground for a new trial under Rule 59.

In determining that the damages award was speculative and excessive, the district court cited three types of evidence from which the jury could have calculated the amount of damages (medical bills, Tortu's physical pain, and his lost job). It then determined that the only evidence from which the jury could properly calculate damages were the medical bills and two weeks of pain and discomfort. The district court had eliminated consideration of lost wages with its explicit instruction to the jury that Tortu's testimony was insufficient to support a claim for lost wages. In reaching the two-week time frame for pain and suffering, the court noted that Tortu never returned to the doctors for requested follow-up visits.

**[9]** The district court found that Tortu's injuries could not justify an award of $175,000 in compensatory and $5,000 in punitive damages. It surmised that the jury awarded the damages, in part, because Tortu lost his job. In closing, the district court stated that it did not believe the jury's award was reasonable and should not have included the lost wages. There was no basis for the court to find that the jury ignored its explicit instruction not to award damages for lost wages, nor was the jury required to limit its findings of pain and suffering to only two weeks because Tortu did not return to the doctors. The jury could reasonably have determined that Tortu thought there was nothing further the doctors could do.

The district court's discussion of excessive damages omitted any mention of the personal humiliation and emotional suffering that Tortu experienced. This omission is inconsistent with the district court's own jury instruction that "[d]amages means the amount of money which will reasonably and fairly compensate the plaintiff for any injury . . . [including] emotional pain and suffering." Furthermore, the Supreme Court has stated that § 1983 damages may include "impairment of reputation, personal humiliation, and mental anguish and suffering." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) (internal punctuation and citation omitted).

**[10]** The district court's failure to consider emotional injury reflects an inaccurate view of the law. "[C]ompensatory damages may be awarded for humiliation and emotional distress established by testimony or inferred from the circumstances, whether or not plaintiffs submit evidence of economic loss or mental or physical symptoms." *Johnson v. Hale*, 13 F.3d 1351, 1352 (9th Cir. 1994). Here the jury found that Engle used unreasonable force against Tortu. Tortu testified before the jury that this force was primarily applied to his testicles, and medical evidence supported this claim. Tortu also testified that the incident caused him excruciating pain, humiliated him, and caused him ongoing embarrassment. We conclude that the jury's verdict is not against the clear weight of the evidence. The district court abused its discretion in granting a new trial.

### III.    Conclusion

For the reasons stated above, we **REVERSE** the district court and **REMAND** with instructions to reinstate the jury's verdict and enter judgment accordingly.

---

N. RANDY SMITH, Circuit Judge, Concurring in Part, Dissenting in Part:

The majority, in Part II.B of its opinion, holds that the district court abused its discretion by granting a new trial. In making that decision regarding the motion for a new trial, the majority fails to accord the trial judge's decision the appropriate deference when applying an "abuse of discretion" standard. While only reading the trial transcripts, the majority substitutes its contested view of the trial evidence and calls the trial court's view of the same evidence an abuse. Therefore, I dissent from that part of the opinion.

### I.   Application of the Abuse of Discretion Standard

The Federal Rules of Civil Procedure require that, in cases in which a party has moved for judgment as a matter of law, "the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for a new trial." Fed. R. Civ. P. 50(b).

Our law requires us to affirm a district court's discretionary decision in granting a new trial, if *any* of its grounds for granting a new trial are *reasonable. Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1452 (9th Cir. 1988) (citations omitted). Under this standard, even if substantial evidence supports the jury's verdict, a trial court may grant a new trial (1) if the verdict is (a) contrary to the clear weight of the evidence or (b) is based upon evidence which is false, (2) to prevent a miscarriage of justice, or (3) if the award of compensation is excessive. *See Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999) (citation omitted); *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990). In determining the clear weight of the evidence, a district court has "the duty[ ] to weigh the evidence as [the court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence . . . ." *Murphy*, 914 F.2d at 187 (quoting *Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246, 256 (9th Cir. 1957)). When it is necessary to prevent, in the sound discretion of the trial judge, a miscarriage of justice the district court may also weigh the evidence and set aside the verdict. *Id.* The district court may also grant a new trial when in his judgment the trial judge finds that the "amount of compensation awarded is excessive." *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th Cir. 1976) (citation and internal quotation marks omitted); *see also Fenner v. Dependable Trucking Co.,*

*Inc.*, 716 F.2d 598, 603 (9th Cir. 1983) (stating "[o]nce the trial court finds a verdict excessive, the court cannot allow it to stand."). Therefore, in a nut shell, the district court may grant a new trial "[i]f, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . ." *Landes Constr. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371-72 (9th Cir. 1987).

The law grants trial courts judicial discretion in making this decision for two reasons: (1) the trial judge is the only objective person (with legal training), who was at the trial and able to see, hear, and evaluate the situation using firsthand knowledge; and (2) it would be impossible to construct any strict rule, which would be applicable to every conceivable motion for a new trial. Therefore, to reverse a district court under the abuse of discretion standard, an "appellate court [has to be] convinced firmly that the reviewed decision lies beyond the pale of reasonable justification under the circumstances." *Harman v. Apfel*, 211 F.3d 1172, 1175 (9th Cir. 2000). I emphasize this is not the review of a trial court's determination of a motion for summary judgment (de novo review) or a motion for a judgment as a matter of law (de novo review), which motion is generally made at the same time as the motion for new trial. Instead, we are reviewing whether the trial judge (vested by law to use his discretion in the four above mentioned circumstances) abused it in granting a new trial.

In this case, the district court granted the motion for a new trial on the grounds that (1) the jury's verdict was against the clear weight of the evidence, (2) Officer Engle was protected by the doctrine of qualified immunity, and (3) the jury's award was excessive and based on speculation. Given this record, the district court did not abuse its discretion.

## II. Clear Weight of the Evidence

The district court did not abuse its discretion, when it granted a new trial because the jury's verdict was against the

clear weight of the evidence. Again, when a motion for a new trial is made, on the ground that the weight of the evidence is contrary to the jury's verdict, the judge is free to weigh the evidence for himself. *See Murphy*, 914 F.2d at 187; *see also* 11 Charles Alan Wright et al., *Federal Practice and Procedure* § 2806 (2008) (citations omitted).

Two very different stories were told at trial, describing what transpired on July 9, 2001. Reviewing the evidence, it clearly indicated that Tortu's testimony, (regarding the events that occurred in the terminal and jetway) was wholly inaccurate and unbelievable. After weighing the evidence, the district court found that, to arrive at its verdict (that Officer Cashton and Officer Cowley did not use an unreasonable amount of force, but Officer Engle did use an unreasonable amount of force), the jury would have had to believe the officers' testimony on every issue, except as to Officer Engle's conduct on the Tarmac and in the police SUV. The jury also would have had to disbelieve all of Tortu's story except that his injuries were caused by Officer Engle's conduct. Having been at the trial and therefore able to see, hear, and evaluate the testimony first hand, the district court found that the verdict was against the clear weight of the evidence.

These facts, among others, substantiate the district court's reasoning. Tortu alleged that Officer Engle (while standing outside the driver's door) reached between the front seats and the mounted mobile computer terminal and squeezed Tortu's testicles (who at the time was seated in the middle back seat of the Ford Excursion police SUV). Officer Engle's ability to make these maneuvers (while standing outside the car) seems highly improbable, if not impossible. Tortu also could not conclusively identify which officer, if any, actually squeezed his testicles.[1] All of the other witnesses credibly testified that

---

[1]On direct examination, Tortu stated that Officer Engle squeezed his testicles. However, on cross examination, Tortu admitted that he testified during his deposition that he was not sure whether it was Officer Engle or Officer Cowley.

no officer squeezed Tortu's testicles. Further, there is no evidence (absent Tortu's testimony) that Officer Engle punched Tortu in the back of the head or threw him on the tarmac. All other witnesses testified that Tortu was not thrown on the tarmac or punched in the back of the head. The tarmac was very dirty and oily, and yet Tortu's light-colored shirt showed no signs of dirt or grime.

While these facts support the court's decision, the majority ignores them in its decision. Instead, after reading the transcript, the majority accepts Tortu's otherwise wholly incredible testimony, and the medical evidence regarding his injury, and declares that the clear weight of the evidence supported the jury's verdict. I question their view. It is not enough to say that the medical evidence demonstrates that Tortu sustained injuries to his testicles. It is not enough to say that "Engle had no evidence of how else that injury could have occurred." Engle had no evidentiary burden to prove how the injury occurred. Given this altercation between Tortu and the officers, the injury very well could have happened without Officer Engle having been responsible.

I make this point, not to suggest that either the district court or the majority are right. My point is that this argument about facts (in which the majority involves itself) does not support a finding of abuse of discretion. Evaluating the evidence, the district judge had a definite and firm conviction that the jury made a mistake when it held Officer Engle responsible. Reviewing the record, I cannot find abuse in the district court's discretionary decision.

## III.   *Qualified Immunity*

The district court did not abuse its discretion when it ordered a new trial to determine qualified immunity. The Supreme Court has stated that qualified immunity issues should be resolved as early on as possible. *See Saucier v. Katz*, 533 U.S. 194, 200 (2001) ("Where the defendant seeks

qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive."). Generally issues of qualified immunity are resolved by the court on summary judgment. However, when material issues of fact are in dispute, the jury must determine the facts regarding immunity issues. *See Torres v. City of Los Angeles*, 548 F.3d 1197, 1210-11 (9th Cir. 2008) (citing *Sloman v. Tadlock*, 21 F.3d 1462, 1468 (9th Cir. 1994) (explaining that the reasons for the existence of the qualified immunity doctrine "do not . . . suggest that a *judicial* determination at [the trial] stage is necessarily better than a jury verdict." (emphasis and alterations in original)). Neither party moved for summary judgment on the qualified immunity issue prior to trial. Engle first raised it, just prior to asking the jury to deliberate and render a verdict. The district court declined to address the issue at that time, instead taking the issue under advisement.

The majority correctly states "[w]hen a police officer asserts qualified immunity, we apply a two-part analysis under *Saucier*." *Id.* at 1210. The first question is whether "the officer's conduct violated a constitutional right." *Saucier*, 533 U.S. at 201. The second question under *Saucier* is whether the right was "clearly established." *Id.* at 202. In determining whether a right was "clearly established" the question is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id.*

The jury found that Officer Engle "used an unreasonable amount of force on Plaintiff." The jury also found that "the excessive force used against him caused him $175,000 in compensatory damage." Those findings indicate that the evidence satisfied the first step of the *Saucier* analysis. However, the district court found that verdict to be against the clear weight of the evidence.

When a case proceeds to trial, "qualified immunity can no longer rightly be called an 'immunity from suit' (since the suit

has already proceeded to its conclusion); rather, it is now effectively a defense." *Sloman*, 21 F.3d at 1468 n.6. Given its decision regarding the evidence, the district court did not abuse its discretion in granting Officer Engle a new trial, in order to determine whether he had violated Tortu's constitutional rights. Officer Engle should not lose his defense of qualified immunity, when the court found the verdict to be against the clear weight of evidence.

Even though it found the jury's verdict to be against the clear weight of evidence, the district court also applied the second step of the *Saucier* analysis to determine if Officer Engle was entitled to immunity. Because the jury had not been questioned in the verdict form regarding its basis in determining that Officer Engle had used excessive force on Tortu, the court was forced to undertake the *Saucier* analysis using all of the facts the jury could have used to make the determination. The district court found that there were two reasons for which the jury could have found excessive force on the part of Officer Engle: (1) squeezing Tortu's testicles and (2) punching Tortu on the back of the head.[2] Quoting Supreme Court precedent to find the correct law to apply to those facts, the district court then reasoned that (1) Tortu's constitutional rights were not clearly established; and (2) any mistake of fact, Officer Engle made, was reasonable given the circumstances of Tortu's arrest. While an appellate court may disagree with the district court's determination of this issue, these circumstances do not present a situation where granting a new trial would be an abuse of discretion. Granting a new trial, rather than determining the issue of qualified immunity using disputed facts from the trial, cannot be an abuse of dis-

---

[2]While the majority states that "the vital evidence upon which the jury obviously relied is the squeezing of Tortu's testicles in the SUV," there is absolutely no jury finding in this record to support that view. The district court, who attended the trial, disagrees. That vacuum in the record is the reason the district court had to conduct the second step of the *Saucier* analysis using both the squeezing action and punching Tortu on the back of the head.

cretion. The disputed facts are still unresolved by the trial, because (1) the jury verdict was against the clear weight of the evidence or (2) the jury was not asked enough questions to resolve the disputed facts. The majority attempts to gloss over this point, by stating that the application of the second prong of the *Saucier* analysis is merely a question of law. On that point, they err. When the facts are undisputed and the jury has properly found a violation of constitutional rights, then determining whether those rights are clearly established (based on those same undisputed facts) is a question of law. However, when the facts are disputed and a trial does not resolve which facts are a violation of a constitutional right, a court cannot determine, as a matter of law, whether those rights are clearly established.

Those are the very circumstances of this case. From reading their opinions, both the district court and the majority agree that punching Tortu on the head would be an action in which Engle could engage and yet be entitled to immunity in these circumstances. Only when applying the qualified immunity analysis to Tortu's testicle injury do they disagree. Yet the jury was never asked the basis of their finding of unreasonable force, therefore the majority's analysis fails. Again, we are not here on summary judgment with de novo review and construing the facts in Tortu's favor. We also should not speculate (as the majority seemingly does) as to which facts the jury found to be in violation of Tortu's constitutional rights, and decide if those rights were clearly established.

A new trial to determine those facts is therefore not an abuse. We must be certain "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *See Saucier*, 533 U.S. at 202.

## IV.    *Speculative Damages Award*

The district court found that Officer Engle was entitled to a new trial, because the jury's award of damages was specula-

tive, excessive, and unsupported by clear weight of the evidence. The damages were speculative, because the minimal injuries suffered by Tortu could not support such a wide differential between the cost of Tortu's medical treatment (an amount of less than $5,000) and the ultimate award ($175,000). Accordingly, to avoid a miscarriage of justice, the district court concluded that a new trial was necessary.

Tortu presented evidence that his medical bills amounted to less than $5,000. Tortu's pain and suffering lasted no longer than two weeks. There was no evidence presented that the injury prevented Tortu from performing any ordinary tasks, or that he suffered even minimal discomfort after two weeks. The trial judge is in the best position to weigh the evidence of Tortu's embarrassment and humiliation. These facts support the conclusion that the clear weight of the evidence in the record did not support the jury's award. While one may disagree with the trial court, one cannot say that it abused its discretion in making the decision. These facts support its view.

We have also affirmed other district courts in similar situations. *Oltz*, 861 F.2d at 1453 (affirming the trial court's grant of motion for new trial based on its findings that damages were excessive); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1050 (9th Cir. 1981) (same); *Hanson*, 541 F.2d at 1359 (same).

### V. Conclusion

I disagree with the majority. The district court's granting of the motion for a new trial does not lie beyond the pale of reasonable justification under these circumstances. We must affirm if any of the grounds for granting a new trial are reasonable. *Oltz*, 861 F.2d at 1452.